(Slip Opinion) OCTOBER TERM, 2023 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CONSUMER FINANCIAL PROTECTION BUREAU ET AL. *v.* COMMUNITY FINANCIAL SERVICES ASSOCIATION OF AMERICA, LTD., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 22–448.   Argued October 3, 2023—Decided May 16, 2024

The Constitution gives Congress control over the public fisc subject to the command that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." Art. I, §9, cl. 7. For most federal agencies, Congress provides funding through annual appropriations. For the Consumer Financial Protection Bureau, however, Congress provided a standing source of funding outside the ordinary annual appropriations process. Specifically, Congress authorized the Bureau to draw from the Federal Reserve System an amount that its Director deems "reasonably necessary to carry out" the Bureau's duties, subject only to an inflation-adjusted cap. 12 U. S. C. §§5497(a)(1), (2). In this case, several trade associations representing payday lenders and credit-access businesses challenged regulations issued by the Bureau pertaining to high-interest consumer loans on statutory and constitutional grounds. As relevant here, the Fifth Circuit accepted the associations' argument that the Bureau's funding mechanism violates the Appropriations Clause.

*Held*: Congress' statutory authorization allowing the Bureau to draw money from the earnings of the Federal Reserve System to carry out the Bureau's duties satisfies the Appropriations Clause. Pp. 5–19, 22.

   (a) Under the Appropriations Clause, an appropriation is a law that authorizes expenditures from a specified source of public money for designated purposes.

     (1) The Bureau's funding is "drawn from the Treasury" and is therefore subject to the requirements of the Appropriations Clause. The issue is whether the Bureau's funding mechanism constitutes an

"Appropriatio[n] made by Law." The Court concludes that the answer
is yes based on the Constitution's text, the history against which that
text was enacted, and congressional practice immediately following
ratification. Pp. 5–15.

(i) The Constitution's use of the term "appropriation" provides
important insight into its meaning. The Appropriations Clause itself
specifies that an appropriation must authorize withdrawals from a
particular source, the "Treasury." And, the proviso limiting Congress'
power to "raise and support Armies"—that "no Appropriation of Money
to that Use shall be for a longer Term than two Years"—indicates that
appropriations assign funds for specific uses. Contemporary diction-
ary definitions support this conclusion as well. The evidence suggests
that, at a minimum, appropriations were understood as a legislative
means of authorizing expenditures from public funds for designated
purposes. P. 7.

(ii) Pre-founding history supports the conclusion that an identi-
fied source and purpose are all that is required for a valid appropria-
tion. The concept of legislative appropriations grew out of the broader
struggle between Parliament and the Crown for popular control of the
purse in England. Parliament had little claim to direct how the
Crown's hereditary revenues were spent, but "extraordinary revenues"
required parliamentary authorization because they were financed
through various forms of taxation. In granting these revenues, Parlia-
ment began exercising an attendant power to specify how the Crown
used the funds. The ensuing power struggle culminated in Parliament
stripping away the remnants of the Crown's hereditary revenues. Sub-
sequently, Parliament's usual practice was to appropriate government
revenue to particular purposes and to limit the duration of its revenue
grants. But, not all appropriations were time limited. Some statutes
granting money gave the Crown broad discretion regarding how much
to spend within an appropriated sum. Pp. 8–10.

The appropriations practice in the Colonies and early state legisla-
tures was much the same. Many early state constitutions vested the
legislative body with power over appropriations, and state legislative
bodies often opted for open-ended, discretionary appropriations. By
the time of the Constitutional Convention, it was uncontroversial that
the powers to raise and disburse public money would reside in the Leg-
islative Branch. The origins of the Appropriations Clause confirm that
appropriations needed to designate particular revenues for identified
purposes, but beyond that limit, early legislative bodies exercised a
wide range of discretion. Pp. 10–12.

(iii) The practice of the First Congress also illustrates the
source-and-purpose understanding of appropriations. Many early ap-
propriations laws made annual lump-sum grants for the Government's

expenses. As in England, the appropriation of "sums not exceeding" a specified amount provided the Executive discretion over how much to spend up to a cap. Congress took even more flexible approaches to appropriations for several early executive agencies, allowing them to indefinitely fund themselves from revenue collected. For example, Congress adopted open-ended fee- and commission-based funding schemes for Customs Service and the Post Office. Pp. 12–15.

(2) The Bureau's funding statute satisfies the requirements of the Appropriations Clause. The statute authorizes the Bureau to draw public funds from a particular source—"the combined earnings of the Federal Reserve System"— in an amount not exceeding an inflation-adjusted cap. 12 U. S. C. §§5497(a)(1), (2)(A)–(B). And, it specifies the objects for which the Bureau can use those funds—to "pay the expenses of the Bureau in carrying out its duties and responsibilities." §5497(c)(1). The Bureau's funding mechanism also fits comfortably within the historical appropriations practice described above. P. 15–16.

(b) The associations' three principal arguments for why the Bureau's funding mechanism violates the Appropriations Clause are unpersuasive. Pp. 16–19.

(1) The associations argue that the Bureau's funding is not "drawn . . . in Consequence of Appropriations made by Law" because the agency itself decides the amount of annual funding to draw from the Federal Reserve System. But, appropriations of "sums not exceeding" a certain amount were commonplace immediately after the founding. Congress did not violate the Appropriations Clause by permitting the Bureau to decide how much funding to draw up to a cap. Pp. 16–17.

(2) The associations suggest that the Appropriations Clause requires both Chambers of Congress to periodically agree on an agency's funding, which ensures that each Chamber reserves the power to unilaterally block those funding measures through inaction. While the Constitution expressly provides that "no Appropriation of Money" to support an army "shall be for a longer Term than two Years," Art. I, §8, cl. 12, the Constitution does not explicitly limit the duration of appropriations for other purposes. The First Congress' practice confirms this understanding, as appropriations that supplied funding to the Customs Service and the Post Office were not time limited. The associations resist the analogy to the Post Office and other fee-based agencies, arguing that such agencies do not enjoy the same level of fiscal independence as the Bureau. But, the associations fail to explain the relevance of that difference to the question whether a law complies with the constitutional imperative of an appropriation. Pp. 17–18.

(3) Finally, the associations contend that if the Bureau's funding

mechanism is consistent with the Appropriations Clause, then Congress could do the same for any—or every—civilian agency, allowing the Executive to operate free of any meaningful fiscal check. But, the Appropriations Clause is simply a limitation on Congress' power over the purse, and the associations err by reducing the power of the purse to only the principle expressed in the Appropriations Clause. They offer no defensible argument that the Appropriations Clause requires more than a law that authorizes the disbursement of specified funds for identified purposes. Pp. 18–19.

51 F. 4th 616, reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, KAVANAUGH, BARRETT, and JACKSON, JJ., joined. KAGAN, J., filed a concurring opinion, in which SOTOMAYOR, KAVANAUGH, and BARRETT, JJ., joined. JACKSON, J., filed a concurring opinion. ALITO, J., filed a dissenting opinion, in which GORSUCH, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

―――――――
No. 22–448
―――――――

## CONSUMER FINANCIAL PROTECTION BUREAU, ET AL., PETITIONERS *v.* COMMUNITY FINANCIAL SERVICES ASSOCIATION OF AMERICA, LIMITED, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[May 16, 2024]

JUSTICE THOMAS delivered the opinion of the Court.

Our Constitution gives Congress control over the public fisc, but it specifies that its control must be exercised in a specific manner. The Appropriations Clause commands that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." Art. I, §9, cl. 7. For most federal agencies, Congress provides funding on an annual basis. This annual process forces them to regularly implore Congress to fund their operations for the next year. The Consumer Financial Protection Bureau is different. The Bureau does not have to petition for funds each year. Instead, Congress authorized the Bureau to draw from the Federal Reserve System the amount its Director deems "reasonably necessary to carry out" the Bureau's duties, subject only to an inflation-adjusted cap. 124 Stat. 1975, 12 U. S. C. §§5497(a)(1), (2). In this case, we must decide the narrow question whether this funding mechanism complies with the Appropriations Clause. We hold that it does.

# I
## A

Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act in response to the 2008 financial crisis. 124 Stat. 1376. The Act created an independent financial regulator within the Federal Reserve System known as the Bureau of Consumer Financial Protection. 12 U. S. C. §5491(a). Congress charged the Bureau with enforcing consumer financial protection laws to ensure "that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." §5511(a). The Act consolidated in the Bureau the authority to administer 18 existing consumer protection statutes, among them the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, and the Home Mortgage Disclosure Act of 1975. §§5512(a), 5481(12), (14). Additionally, the Act made it unlawful for those offering consumer financial products and services "to engage in any unfair, deceptive, or abusive act or practice." §5536(a)(1)(B). Congress vested the Bureau with rulemaking, enforcement, and adjudicatory authority over the statutes that it administers. See §§5531(a)–(b), 5581(a)(1)(A), (b) (rulemaking authority); §§5562–5565 (enforcement and adjudicatory authority).

In addition to vesting the Bureau with sweeping authority, Congress shielded the Bureau from the influence of the political branches. To insulate the Bureau from the President's control, Congress put a single Director with a 5-year term at the Bureau's helm and made the Director removable only for inefficiency, neglect, or malfeasance. §§5491(b)–(c). This Court held in *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. 197 (2020), that the combination of single-Director leadership and for-cause removal protection unconstitutionally circumscribed the President's ability to oversee the Executive Branch. *Id.,*

at 208.

This case involves another one of the Bureau's novel structural features, one that limits Congress' control. Congress supplies most federal agencies with the funds necessary for their operations only on an annual basis, so those agencies must ask Congress for renewed funding each year. For the Bureau, however, Congress diminished this accountability by providing the Bureau a standing source of funding outside the ordinary annual appropriations process. Each year, the Bureau may requisition from the earnings of the Federal Reserve System "the amount determined by the [Bureau's] Director to be reasonably necessary to carry out" its duties, subject only to a statutory cap. §5497(a)(1). The Bureau cannot request more than 12 percent of the Federal Reserve System's total operating expenses as reported in fiscal year 2009 (adjusted for inflation). §§5497(a)(2)(A)–(B). In fiscal year 2022, that cap was about $734 million. See Consumer Financial Protection Bureau, Financial Report of the Consumer Financial Protection Bureau 7 (Fiscal year 2022). The Bureau can also retain and invest unused funds from year to year, though the Director must take into account any surplus when requesting additional funds. §§5497(a)(1), (b)(3), (c).

B

In 2017, the Bureau promulgated a regulation focused on high-interest consumer loans. See Payday, Vehicle Title, and Certain High-Cost Installment Loans, 12 CFR pt. 1041 (2018) (Payday Lending Rule). Among other things, the regulation restricts lenders' ability to obtain loan payments through preauthorized account access after two unsuccessful withdrawal attempts. *Ibid.* The Community Financial Services Association of America and Consumer Service Alliance of Texas, trade associations that represent payday lenders and credit-access businesses, challenged the Payday Lending Rule on statutory and constitutional grounds.

In the operative complaint, the associations argued, among other things, that the Bureau "takes federal government money without an appropriations act" in violation of the Appropriations Clause. Amended Complaint in No. 1:18–cv–00295 (WD Tex.), ECF Doc. 76, p. 30.

The District Court granted summary judgment to the Bureau. As relevant, the court explained that "[t]he Appropriations Clause 'means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'" 558 F. Supp. 3d 350, 364 (WD Tex. 2021) (quoting *Office of Personnel Management* v. *Richmond*, 496 U. S. 414, 424 (1990)). And, because "a statute authorizes" the disbursements from the Federal Reserve System's combined earnings to the Bureau "up to a certain cap," the District Court concluded, "there is no Appropriations Clause issue." 558 F. Supp. 3d, at 364. On appeal, the associations renewed their argument that the "Bureau's funding mechanism usurps Congress's role in the appropriation of federal funds" by allowing it to take "federal money without an appropriations act." Brief for Appellants in No. 21–50826 (CA5), p. 28.

The Court of Appeals agreed with this argument and reversed. 51 F. 4th 616 (CA5 2022). Drawing on the Constitution's text and history, the court concluded that the Appropriations Clause "does more than reinforce Congress's power over fiscal matters; it affirmatively obligates Congress to use that authority 'to maintain the boundaries between the branches and preserve individual liberty from the encroachments of executive power.'" *Id.,* at 637 (quoting *Consumer Financial Protection Bureau* v. *All Am. Check Cashing, Inc.*, 33 F. 4th 218, 231 (CA5 2022) (en banc) (Jones, J., concurring)). By giving the Bureau a "self-actualizing, perpetual funding mechanism," the court reasoned, Congress in effect abandoned this obligation. 51 F. 4th, at 638–639. It was not enough that Congress enacted the law authorizing the Bureau's funding because a "law alone does

not suffice—an *appropriation* is required." *Id.*, at 640. The court thus held that the Bureau's funding mechanism violates the Appropriations Clause. *Id.*, at 642.

We granted certiorari to address the narrow question whether the statute that provides funding to the Bureau violates the Appropriations Clause. 598 U. S. ___ (2023). We now reverse.

## II

Under the Appropriations Clause, an appropriation is simply a law that authorizes expenditures from a specified source of public money for designated purposes. The statute that provides the Bureau's funding meets these requirements. We therefore conclude that the Bureau's funding mechanism does not violate the Appropriations Clause.

## A

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." Art. I, §9, cl. 7. Textually, the command is unmistakable—"no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Cincinnati Soap Co.* v. *United States*, 301 U. S. 308, 321 (1937). Our decisions have long given the Appropriations Clause this straightforward reading. See, *e.g., Office of Personnel Management*, 496 U. S., at 424 ("Money may be paid out only through an appropriation made by law; in other words, the payment of money from the Treasury must be authorized by a statute"); *Reeside* v. *Walker*, 11 How. 272, 291 (1851) ("However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not . . . previously sanctioned" through an appropriation made by Congress).

As a threshold matter, the parties agree that the Bureau's funding must comply with the Appropriations Clause. The Appropriations Clause applies to money

"drawn from the Treasury." Art. I, §9, cl. 7. The Bureau draws money from the Federal Reserve System. 12 U. S. C. §5497(a)(1). And, surplus funds in the Federal Reserve System would otherwise be deposited into the general fund of the Treasury. §289(a)(3)(B). Whatever the scope of the term "Treasury" in the Appropriations Clause, money otherwise destined for the general fund of the Treasury qualifies. The Bureau's funding is therefore subject to the requirements of the Appropriations Clause.

The associations' challenge turns solely on whether the Bureau's funding mechanism constitutes an "Appropriatio[n] made by Law." This question divided the courts below. The District Court concluded that a valid appropriation is nothing more than a statute that "authorizes an agency to receive funds up to a certain cap." 558 F. Supp. 3d, at 364; see also *Consumer Financial Protection Bureau* v. *Law Offices of Crystal Moroney*, 63 F. 4th 174, 181 (CA2 2023). The Court of Appeals, on the other hand, suggested that appropriations must also "meet the Framers' salutary aims of separating and checking powers and preserving accountability to the people." 51 F. 4th, at 640. The associations defend this understanding and argue that the statute that provides the Bureau's funding undermines these aims by allowing the agency to indefinitely choose its own level of annual funding, subject only to an illusory cap. That is, the associations contend that the Bureau's funding mechanism is too open-ended in duration and amount to satisfy the requirement that there be an "Appropriatio[n] made by Law."

Based on the Constitution's text, the history against which that text was enacted, and congressional practice immediately following ratification, we conclude that appropriations need only identify a source of public funds and authorize the expenditure of those funds for designated purposes to satisfy the Appropriations Clause.

1

The Constitution's text requires an "Appropriatio[n] made by Law." Art. I, §9, cl. 7. Our concern is principally with the meaning of the word "appropriation." The Constitution's use of the term "appropriation" in the Appropriations Clause and in other Clauses provides important contextual clues about its meaning. To state the obvious, the Appropriations Clause itself makes clear that an appropriation must authorize withdrawals from a particular source—the public treasury. It provides that money may be "drawn from the Treasury" only "in Consequence of Appropriations made by Law." Cl. 7. The section preceding the Appropriations Clause further suggests that appropriations assign funds for specific uses: Congress has the power to "raise and support Armies," but subject to the limitation that "no Appropriation of Money to that Use shall be for a longer Term than two Years." §8, cl. 12.

At the time the Constitution was ratified, "appropriation" meant "[t]he act of sequestering, or assigning to a particular use or person, in exclusion of all others." 1 N. Webster, An American Dictionary of the English Language (1828); see also 1 J. Ash, The New and Complete Dictionary of the English Language (2d ed. 1795) ("[t]he application of something to a particular use"); 1 S. Johnson, A Dictionary of the English Language (6th ed. 1785) ("[t]he application of something to a particular purpose"); T. Dyche & W. Pardon, A New General English Dictionary (14th ed. 1771) ("the appointing a thing to a particular use"). In ordinary usage, then, an appropriation of public money would be a law authorizing the expenditure of particular funds for specified ends.

Taken as a whole, this evidence suggests that, at a minimum, appropriations were understood as a legislative means of authorizing expenditure from a source of public funds for designated purposes.

2

Pre-founding history supports the conclusion that an identified source and purpose are all that is required for a valid appropriation. The concept of legislative "appropriations" grew out of the broader struggle for popular control of the purse in England. Throughout the Middle Ages, the King enjoyed near total fiscal independence. At that time, the King's revenues came largely from hereditary sources, sometimes called "ordinary" revenues. 1 W. Blackstone, Commentaries on the Laws of England 281 (1771) (Commentaries). These ordinary revenues flowed from many sources, including the "rents and profits of the demesne lands of the crown," *id.*, at 286, and the fines, forfeitures, and fees "arising from the king's ordinary courts of justice," *id.*, at 289. Because this revenue inhered in the King himself, Parliament had little claim to direct how it was spent. See F. Maitland, The Constitutional History of England 430 (1908) (Maitland).

But, when these unencumbered ordinary revenues did not satisfy the demands of royal governance, most often during wartime, the King had to seek what Blackstone called "*extraordinary* revenue." Commentaries 306. Extraordinary revenues were financed through various forms of taxation and therefore required parliamentary authorization. *Id.*, at 169, 307; see Magna Charta, ch. 12 (1215), in A. Howard, Magna Carta: Text and Commentary 40 (rev. ed. 1998). In granting extraordinary revenues, Parliament began exercising an attendant power to specify how the Crown used these funds. Maitland 183–184; see also T. Taswell-Langmead, English Constitutional History: From the Teutonic Conquest to the Present Time 219, 229 (6th ed. 1905). That is, Parliament "claimed the power to appropriate the supplies granted to the king." Maitland 183–184.

Conditions in the 17th century shifted the balance of power toward Parliament. A combination of rising prices and increasing demands made it so that the King's ordinary

revenues could not satisfy the costs of royal governance, even in times of peace. D. Keir, The Constitutional History of Modern Britain Since 1485, pp. 180–181 (6th ed. 1960); P. Einzig, The Control of the Purse 57 (1959). The King's financial weakness, and Parliament's increasing assertiveness in appropriating extraordinary revenues, led to intragovernmental strife. The ensuing power struggle culminated in the Glorious Revolution, in which Parliament stripped away the remnants of the King's hereditary revenues and thereby secured supremacy in fiscal matters. Commentaries 306, 333; Maitland 434.

Following the Glorious Revolution, Parliament's usual practice was to appropriate government revenue "to particular purposes more or less narrowly defined." *Id.,* at 433. Additionally, Parliament began limiting the duration of its revenue grants. For example, the duties on tonnage and poundage were no longer granted to the King for life, but only for a term of years. See 2 Wm. & Mary, c. 4, §1 (1690); 6 Wm. & Mary, c. 1, §1 (1694); see also D. Gill, The Treasury, 1660–1714, 46 Eng. Hist. Rev. 600, 610 (1931). Limiting the duration of these and other revenue grants ensured that the King could not rule without Parliament. As one historian described it, Parliament made sure "the Crown should be altogether unable to pay its way without an annual meeting of Parliament. . . . Every year he and his Ministers had to come, cap in hand, to the House of Commons, and more often than not the Commons drove a bargain and exacted a *quid pro quo* in return for supply." G. Trevelyan, The English Revolution 1688–1689, pp. 180–181 (1939).

Even with this newfound fiscal supremacy, Parliament did not micromanage every aspect of the King's finances. Not all post-Glorious Revolution grants of supplies were time limited. A notable exception involved what came to be known as the civil list. Despite its established power to limit the duration of revenue grants, Parliament deemed it proper to cover the expenses of the King's household and

the civil government by appropriating revenue to that pur-
pose for life. Maitland 435–436; see also E. Reitan, The
Civil List in Eighteenth-Century British Politics, 9 Hist. J.
318, 319 (1966) (Reitan) (explaining that the "Crown was to
meet the costs of the civil government" out of the civil list,
including "the fees and salaries of the ministers and many
other public officers, the salaries of many of the small fry in
various government departments, the salaries and pen-
sions of judges, the salaries and allowances of ambassadors
and consuls, and the maintenance of buildings for Parlia-
ment and the public offices"). And, parliamentary grants of
supplies ordinarily gave the Crown broad discretion regard-
ing how much to spend within an appropriated sum. Stat-
utes granting money often stated that the Crown could
spend "any Sum not exceeding" a particular amount. See,
*e.g.*, 13 Anne, c. 18, §69 (1713); 1 Anne, c. 6, §130 (1702).
These grants were permissive. As Maitland explained,
"Money is granted to the queen; it is placed at the disposal
of her and her ministers. But she and they are not bound
by law to spend it, at least not bound by the Appropriation
Act." Maitland 445. Other parliamentary appropriations
acts, however, *required* that money be spent for particular
purposes. See, *e.g.*, 2 Wm. & Mary, c. 1, §§35–36 (1690); 3
Wm. & Mary, c. 5, §§42–43 (1691); see also M. Rappaport,
The Selective Nondelegation Doctrine and the Line Item
Veto, 76 Tulane L. Rev. 265, 327, n. 211 (2001) (Rappaport).

The appropriations practice in the Colonies and early
state legislatures was much the same. "When called upon
to grant supplies," the lower houses in the colonial assem-
blies "insisted upon appropriating them in detail." J.
Greene, The Quest for Power: The Lower Houses of Assem-
bly in the Southern Royal Colonies 1689–1776, p. 88 (1963).
Many early state constitutions vested the legislative body
with power over appropriations. Rappaport 332–333. And,
in exercising that authority, state legislative bodies often
opted for open-ended, discretionary appropriations. See,

*e.g.*, Act of Mar. 31, 1788, 1787 Mass. Acts and Laws ch. 63, p. 657 ("[T]he amount of all duties collected by virtue of this Act shall be, and is hereby appropriated to & for the support of the civil government of this Commonwealth"); Act of Nov. 17, 1786, 1786 Mass. Acts and Laws ch. 47, p. 117 (appropriating one-third of revenue "for the exigencies of Government"); An act to amend and reduce the several acts for appropriating the public revenue, into one act, 1784 Va. Acts ch. 46, §1, reprinted in 11 W. Hening's Statutes at Large 434 (1823) ("The money arising [from certain taxes] shall form a general fund, ten thousand pounds of which per annum shall be at the disposal of the executive, to defray the contingent charges of government"); An act to amend the act for appropriating the public revenue, 1783 Va. Acts ch. 11, §4, reprinted in *id.,* at 248 (Half of "all the revenue arising from the tax on free male tithables . . . shall be applied . . . to the support of civil government"); An act for the defence of the bay, and to impose certain duties on imported articles, 1783 Md. Acts ch. 26, §5, reprinted in 1 W. Kilty, The Laws of Maryland (1799) ("[A]ll the duties imposed by this act on the trade of this state shall be appropriated for the defence of the bay and the protection of trade").

By the time of the Constitutional Convention, the principle of legislative supremacy over fiscal matters engendered little debate and created no disagreement. It was uncontroversial that the powers to raise and disburse public money would reside in the Legislative Branch. The only disagreement was about whether the right to originate taxation and appropriations bills should rest in a legislative body with proportionate representation. Having reached a tentative agreement on that difference, the Committee of Detail reported a draft constitution giving the House of Representatives the power to originate all revenue and appropriations laws. This proposed draft contained the prototype of what later became the Appropriations Clause. It provided that

"[a]ll bills for raising or appropriating money . . . shall originate in the House of Representatives, and shall not be altered or amended by the Senate. No money shall be drawn from the public Treasury, but in pursuance of appropriations that shall originate in the House of Representatives." 2 Records of the Federal Convention of 1787, p. 178 (M. Farrand ed. 1911). Ultimately, the Convention agreed to grant the House an exclusive power to originate revenue laws but not for appropriations laws. Compare Art. I, §7, cl. 1, with §9, cl. 7.

In short, the origins of the Appropriations Clause confirm that appropriations needed to designate particular revenues for identified purposes. Beyond that, however, early legislative bodies exercised a wide range of discretion. Some appropriations required expenditure of a particular amount, while others allowed the recipient of the appropriated money to spend up to a cap. Some appropriations were time limited, others were not. And, the specificity with which appropriations designated the objects of the expenditures varied greatly.

3

The practice of the First Congress also illustrates the source-and-purpose understanding of appropriations. This practice "provides contemporaneous and weighty evidence of the Constitution's meaning." *Bowsher* v. *Synar*, 478 U. S. 714, 723 (1986) (internal quotation marks omitted).

Many early appropriations laws made annual lump-sum grants for the Government's expenses. Congress' first annual appropriations law, for instance, divided Government expenditures into four broad categories and authorized disbursements up to certain amounts for those purposes. For example, the law appropriated a "sum not exceeding two hundred and sixteen thousand dollars for defraying the expenses of the civil list," which covered most nonmilitary executive officers' salaries and expenses. Act of Sept. 29,

1789, ch. 23, 1 Stat. 95; see 5 Papers of Alexander Hamilton 381–388 (H. Syrett & J. Cooke eds. 1962) (reporting detailed line-item estimates for civil-list expenditures). And, it appropriated "a sum not exceeding one hundred and thirty-seven thousand dollars for defraying the expenses of the department of war." 1 Stat. 95. The law specified that the disbursements would "be paid out of the monies which arise, either from the requisitions heretofore made upon the several states, or from the duties on impost and tonnage." *Ibid.* Subsequent annual appropriations laws followed a similar pattern. See Act of Mar. 26, 1790, ch. 4, 1 Stat. 104; Act of Feb. 11, 1791, ch. 6, 1 Stat. 190; Act of Dec. 23, 1791, ch. 3, 1 Stat. 226.

The appropriation of "sums not exceeding" a specified amount did not by itself mandate that the Executive spend that amount; as was the case in England, such appropriations instead provided the Executive discretion over how much to spend up to a cap. In 1803, for instance, Congress appropriated "a sum not exceeding fifty thousand dollars" to build up to "fifteen gun boats." Act of Feb. 28, 1803, ch. 11, 2 Stat. 206. President Jefferson subsequently reported, however, that "[t]he sum of fifty thousand dollars appropriated by Congress for providing gun boats remains unexpended. The favorable and peaceable turn of affairs on the Mississippi rendered an immediate execution of that law unnecessary." 13 Annals of Cong. 14 (1803).

Congress took even more flexible approaches to appropriations for several early executive agencies and allowed the agencies to indefinitely fund themselves directly from revenue collected. Soon after convening, Congress enacted laws that imposed a detailed schedule of duties on imported goods and tonnage. See Act of July 4, 1789, ch. 2, 1 Stat. 24–27 (imposing duties on imported goods, wares, and merchandises); Act of July 20, 1789, ch. 3, 1 Stat. 27–28 (imposing duties on tonnage). It then divided the Nation into customs districts and established a vast federal bureaucracy to

oversee the collection of those duties.  Act of July 31, 1789,
ch. 5, 1 Stat. 29–49.  Rather than fund those customs offi-
cials through annual appropriations, Congress opted for a
fee-based model.  Customs collectors were compensated
through tonnage- and transaction-based fees specified by
law, and through a commission on the amount of duties
raised within their districts.  For example, customs collec-
tors were entitled to collect from merchants two-and-a-half
dollars "for every entrance of any ship or vessel of one hun-
dred tons burthen or upwards" and 20 cents "for every per-
mit to land goods." *Id.,* at 44.  And, collectors in the largest
ports were paid "half a per centum on the amount of all
monies by them respectively received and paid into the
treasury of the United States." *Id.,* at 45.  Other customs
functionaries were also compensated on a fee basis.  For in-
stance, customs collectors paid weighers 18 cents "out of the
revenue" collected "for the measurement of every one hun-
dred bushels of salt or grain." *Ibid.*

Congress adopted a similarly open-ended funding scheme
for the Post Office.  Instead of appropriating funds on an
annual basis, Congress authorized the Postmaster General
to "defray the expense" of carrying the mail of the United
States with the revenues generated through postage assess-
ments.  Act of Feb. 20, 1792, §3, 1 Stat. 234.  The postal
statute also provided the Postmaster General a $2,000 an-
nual salary "to be paid . . . out of the revenues of the post-
office." §8, *id.,* at 235.  And, it authorized the Postmaster
General to pay deputy postmasters "such commission on
the monies arising from the postage of letters and packets,
as he shall think adequate to their respective services," sub-
ject to an upper limit.  §23, *id.,* at 238.  These fee-based
funding schemes continued year after year without Con-
gress passing an annual appropriation for these agencies.

These fee- and commission-based funding schemes were
not an American innovation; they emulated the colonial
precursors to the Customs Service and Post Office.  Colonial

customs officers, for instance, "were paid a percentage of total receipts in their area, the proportion varying from colony to colony depending on the estimated potential yield." T. Barrow, Trade and Empire: The British Customs Service in Colonial America 1660–1775, p. 14 (1967). Although the customs service in the Colonies later transitioned to a salary system, each customs "official was allowed certain fees for almost every transaction." *Id.,* at 78. And, as to the postal service, the Continental Congress allowed postmaster deputies 20 percent "on the sums they collect and pay into the General post office annually," up to $1,000, and 10 percent on sums over that amount. 2 Journals of the Continental Congress, 1774–1789, p. 208 (W. Ford ed. 1905).

Postratification practice therefore confirms our interpretation of the Appropriations Clause. Early appropriations displayed significant variety in their structure. Each, however, adhered to the minimum requirements of an identifiable source of public funds and purpose.

B

The Bureau's funding statute contains the requisite features of a congressional appropriation. The statute authorizes the Bureau to draw public funds from a particular source—"the combined earnings of the Federal Reserve System," in an amount not exceeding an inflation-adjusted cap. 12 U. S. C. §§5497(a)(1), (2)(A)–(B). And, it specifies the objects for which the Bureau can use those funds—to "pay the expenses of the Bureau in carrying out its duties and responsibilities." §5497(c)(1).

Further, the Bureau's funding mechanism fits comfortably with the First Congress' appropriations practice. In design, the Bureau's authorization to draw an amount that the Director deems reasonably necessary to carry out the agency's responsibilities, subject to a cap, is similar to the First Congress' lump-sum appropriations. And, the commission- and fee-based appropriations that supplied the

Customs Service and Post Office provided standing author-
izations to expend public money in the same way that the
Bureau's funding mechanism does.

For these reasons, we conclude that the statute that au-
thorizes the Bureau to draw funds from the combined earn-
ings of the Federal Reserve System is an "Appropriatio[n]
made by Law." We therefore hold that the requirements of
the Appropriations Clause are satisfied.

## III

The associations make three principal arguments for why
the Bureau's funding mechanism violates the Appropria-
tions Clause, each of which attempts to build additional re-
quirements into the meaning of an "Appropriatio[n] made
by Law." None is persuasive.

## A

At the outset, the associations argue that the Bureau's
funding is not "drawn . . . in Consequence of Appropriations
made by Law" because the agency, rather than Congress,
decides the amount of annual funding that it draws from
the Federal Reserve System. This argument proceeds from
a mistaken premise. Congress determined the amount of
the Bureau's annual funding by imposing a statutory cap.
The Bureau's funding statute provides that "the amount
that shall be transferred to the Bureau in each fiscal year
shall not exceed" 12 percent "of the total operating expenses
of the Federal Reserve System" as reported in 2009 and ad-
justed for inflation. §5497(a)(2). The only sense in which
the Bureau decides its own funding, then, is by exercising
its discretion to draw less than the statutory cap. But, as
we have explained, "sums not exceeding" appropriations,
which provided the Executive with the same discretion,
were commonplace immediately after the founding. *Supra*,
at 12–13. Thus, we cannot conclude that Congress violated

the Appropriations Clause by permitting the Bureau to decide how much funding to draw up to a cap.

## B

Next, the associations suggest that the Bureau's funding statute is not a valid appropriation because it is not time limited. On their reading, the Appropriations Clause requires both Chambers of Congress to periodically agree on an agency's funding, which ensures that each Chamber reserves the power to unilaterally block those funding measures through inaction. The Bureau's funding mechanism, the associations insist, inverts this baseline by allowing it to draw funds—forever—unless both Chambers of Congress step in and affirmatively prevent the agency from doing so.

But, the Constitution's text suggests that, at least in some circumstances, Congress can make standing appropriations. The Constitution expressly provides that "no Appropriation of Money" to support an army "shall be for a longer Term than two Years." Art. I, §8, cl. 12. Hamilton explained that this restriction ensures that, for the army, Congress cannot "vest in the Executive department . . . permanent funds" and must instead "once at least in every two years . . . deliberate upon the propriety of keeping a military force on foot," "come to a new resolution on the point," and "declare their sense of the matter, by a formal vote in the face of their constituents." The Federalist No. 26, p. 143 (E. Scott ed. 1898). The Framers were thus aware of the dynamic that the associations highlight, but they did not explicitly limit the duration of appropriations for other purposes.

The First Congress' practice confirms this understanding. Recall that the appropriations that supplied funding to the Customs Service and the Post Office were not time limited. *Supra,* at 13–14. The associations resist the analogy to the Post Office and other fee-based agencies, arguing

that such agencies do not enjoy the same level of fiscal in-
dependence as the Bureau. Fee-based agencies, the associ-
ations reason, "could not demand funds from the federal
fisc, but rather needed to persuade the people they served
to pay them, and the public could refuse to purchase to in-
fluence their conduct." Brief for Respondents 35. The as-
sociations, however, make no attempt to explain why the
possibility that the public's choices could restrain fee-based
agencies' revenue is relevant to the question whether a law
complies with the constitutional imperative that there be
an appropriation.

C

Finally, the associations contend that the Bureau's fund-
ing mechanism provides a blueprint for destroying the sep-
aration of powers, and that it invites tyranny by allowing
the Executive to operate free of any meaningful fiscal check.
If the Bureau's funding mechanism is consistent with the
Appropriations Clause, the associations reason, then Con-
gress could do the same for any—or every—civilian execu-
tive agency. And that, they conclude, would be the very
unification of the sword and purse that the Appropriations
Clause forbids.

The associations err by reducing the power of the purse
to only the principle expressed in the Appropriations
Clause. To be sure, the Appropriations Clause presupposes
Congress' powers over the purse. But, its phrasing and lo-
cation in the Constitution make clear that it is not itself the
source of those powers. The Appropriations Clause is
phrased as a limitation: "No Money shall be drawn from the
Treasury, but in Consequence of Appropriations made by
Law." Art. I, §9. And, it is placed within a section of other
such limitations. Compare *ibid.* ("No Bill of Attainder or ex
post facto Law shall be passed") and *ibid.* ("No Tax or Duty
shall be laid on Articles exported from any State"), with §8
("The Congress shall have Power To . . . "). The associations

offer no defensible argument that the Appropriations Clause requires more than a law that authorizes the disbursement of specified funds for identified purposes. Without such a theory, the associations' Appropriations Clause challenge must fail. See *Haaland* v. *Brackeen*, 599 U. S. 255, 277–278 (2023).

IV

The dissent's theory fares no better. The dissent accepts that the question in this case is ultimately about the meaning of "Appropriations." *Post*, at 6. It faults us for consulting dictionaries to ascertain the original public meaning of that word, insisting instead that "Appropriations" is a "term of art whose meaning has been fleshed out by centuries of history." *Ibid.* But, as we have explained at length, both preratification and postratification appropriations practice support our source-and-purpose understanding. *Supra*, at 8–14. What is more, the dissent never offers a competing understanding of what the word "Appropriations" means. After winding its way through English, Colonial, and early American history about the struggle for popular control of the purse, the dissent declares that "the Appropriations Clause demands legislative control over the source and disposition of the money used to finance Government operations and projects." *Post*, at 17. The dissent never connects its summary of history back to the word "Appropriations." And, even setting that problem aside, it is unclear why the dissent's theory leads to a different outcome: Congress controls the "source and disposition of the money used to finance Government operations and projects" by enacting a law that identifies the source of public funds and authorizes the expenditure of those funds for designated purposes.

The dissent's rendition of history largely ignores the historical evidence that bears most directly on the meaning of

"Appropriations" at the founding—preratification appropri-
ations laws. For example, the dissent spends pages re-
counting how Parliament secured fiscal supremacy and
wielded that power to superintend the King. See *post*, at 7–
11. Although that history is a helpful starting point, see
*supra*, at 8–9, it at most explains why appropriations must
be "made by Law"—not what it means for the legislature to
make an "Appropriation." The dissent does not meaning-
fully grapple with the many parliamentary appropriations
laws that preserved a broad range of fiscal discretion for the
King. See *supra,* at 9–10. It makes no attempt to explain
"sums not exceeding" appropriations. See *ibid.* And, the
dissent brushes aside the civil list, asserting that it "'pre-
sented a constitutional problem in the conflict between the
principle of the independence of the Crown and the princi-
ple of parliamentary control of finance.'" *Post*, at 12 (quot-
ing Reitan 320). The problem was that the King claimed
absolute power to use the sums granted in the civil list as
he pleased and regularly spent in excess of the allotted
amount. See *id.,* at 320, 324–329. But, the dissent never
explains why the reforms that Parliament adopted in re-
sponse to these abuses bear on whether the law establish-
ing the civil list was an "appropriation."

The dissent's treatment of early American history does
not advance its point either. It highlights the undisputed
point that colonial and state legislative bodies exercised the
power of the purse, *post*, at 13, while sidestepping the dis-
cretionary and open-ended appropriations they enacted, *su-
pra*, at 10–11. The dissent quibbles with the open-ended
appropriations laws that we rely on, speculating that state
constitutions somehow constrained the breadth of those
laws. *Post*, at 16–17, n. 13. But, the dissent never explains
how these constitutional provisions informed what it meant
for state legislative bodies to make an "appropriation" and,
in any event, its critique misses the point: It was common-
place for preratification appropriations laws to be open-

ended in a way that is not consistent with the specificity that the dissent's theory appears to require.

When the dissent turns to postratification history, it engages with several appropriations laws enacted by the First Congress. The dissent acknowledges, as it must, that the fee- and commission-based funding schemes for the Customs Service and Post Office show that Congress exercised broad discretion over how to appropriate money. *Post*, at 15–16. To square these funding schemes with its understanding of the Appropriations Clause, the dissent points out that Congress required "fees in excess of what was needed to defray the cost of providing services be turned over to the Treasury." *Post*, at 16. This requirement, the dissent reasons, "ensured that Congress maintained control over the ways in which [the appropriated] money was spent." *Ibid.* But, if what matters is that Congress controls how funds are spent, then we are all in agreement—appropriations must designate the purposes for which money can be spent.

Even under the dissent's "legislative control" theory, its attempt to distinguish the Customs Service and the Post Office from the Bureau is not convincing. The dissent points out that Congress had control over the Customs Service, for instance, because Customs had a "carefully delineated mission" and "early tariff Acts spelled out in excruciating detail the various fees" customs officers could collect, as well as the salaries the officers could be paid from those receipts. *Post*, at 19–20. According to the dissent, the Bureau is different because "[i]ts powers are broad and vast," "[i]t does not collect fees," and "it is permitted to keep and invest surplus funds." *Post*, at 20. But, it is unclear why these differences matter under the dissent's theory. After all, to make a valid appropriation, Congress must designate the objects for which the appropriated funds may be used— as it did here. See 12 U. S. C. §5497(c)(1). Although there may be other constitutional checks on Congress' authority

to create and fund an administrative agency, specifying the source and purpose is all the control the Appropriations Clause requires.

## V

The statute that authorizes the Bureau to draw money from the combined earnings of the Federal Reserve System to carry out its duties satisfies the Appropriations Clause. Accordingly, we reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

---

No. 22–448

---

## CONSUMER FINANCIAL PROTECTION BUREAU, ET AL., PETITIONERS *v.* COMMUNITY FINANCIAL SERVICES ASSOCIATION OF AMERICA, LIMITED, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[May 16, 2024]

JUSTICE KAGAN, with whom JUSTICE SOTOMAYOR, JUSTICE KAVANAUGH, and JUSTICE BARRETT join, concurring.

I join in full the Court's opinion holding that the funding mechanism for the Consumer Financial Protection Bureau complies with the Appropriations Clause. As the Court details, that conclusion emerges from the Clause's "text, the history against which that text was enacted, and congressional practice immediately following ratification." *Ante*, at 6. At its inception, the Clause required only that Congress "identify a source of public funds and authorize the expenditure of those funds for designated purposes." *Ibid.* The Clause otherwise granted Congress "a wide range of discretion." *Ante*, at 12. The result was "significant variety" in appropriations—most notably, as to their specificity, duration, and funding source. *Ante*, at 15; see *ante,* at 12–15. The CFPB's funding scheme, if transplanted back to the late-18th century, would have fit right in.

I write separately to note that the same would have been true at any other time in our Nation's history. "'Long settled and established practice' may have 'great weight'" in interpreting constitutional provisions about the operation of government. *Chiafalo* v. *Washington*, 591 U. S. 578, 592–

593 (2020) (quoting *The Pocket Veto Case*, 279 U. S. 655, 689
(1929)); see also The Federalist No. 37, p. 229 (C. Rossiter
ed. 1961).  And here just such a tradition supports every-
thing the Court says about the Appropriations Clause's
meaning.  The founding-era practice that the Court relates
became the 19th-century practice, which became the 20th-
century practice, which became today's.  For over 200 years
now, Congress has exercised broad discretion in crafting ap-
propriations.  Sometimes it has authorized the expenditure
of a sum certain for an itemized purpose on an annual basis.
And sometimes it has departed from that model in one or
more ways.  All the flexibility and diversity evident in the
founding period has thus continued unabated, making it
ever more obvious that the CFPB's funding accords with the
Constitution.

   For one thing, Congress has never thought it necessary
to designate specific amounts for specific items.  Over the
years, many appropriations have instead given the Execu-
tive leeway to decide how to allocate funds, up to a ceiling,
among a set of activities.  As the Court shows, the First
Congress made appropriations of "sums not exceeding"
stated amounts for "broad categories" of purposes; the Ex-
ecutive then decided the level of funding it would use for all
things within a category.  *Ante*, at 12, 13.  In instituting
those "lump-sum grants," the First Congress created a tem-
plate for later ones to follow.  *Ante*, at 12.  Examples of such
grants "abound in our history."  *Clinton* v. *City of New York*,
524 U. S. 417, 467 (1998) (Scalia, J., concurring in part and
dissenting in part).  During the Civil War, Congress author-
ized the allocation of $76.5 million for various expenses "as
the exigencies of the [Army] may require."  Act of Feb. 25,
1862, ch. 32, 12 Stat. 344–345.  In the Depression, Congress
made $950 million available "for such projects and/or pur-
poses" as the President "in his discretion may prescribe."
Act of Feb. 15, 1934, ch. 13, 48 Stat. 351.  More recent ex-
amples include an appropriation not to exceed $135 million

for uses that the Secretaries of Defense and Energy determine are "necessary for Atomic Energy Defense Activities." Act of Nov. 29, 1989, §1605(a), 103 Stat. 1598. The constitutionality of such measures, Justice Scalia observed, "has never seriously been questioned"—in part because of their prevalence. *Clinton*, 524 U. S., at 467. Our government practice has been "replete with instances of general appropriations" to be "expended as directed by designated government agencies." *Cincinnati Soap Co.* v. *United States*, 301 U. S. 308, 322 (1937). The CFPB's authority to take and allocate moneys up to a statutory cap is just one more instance to add to the list.

Similarly, Congress has never thought appropriations must be annual, or even time-limited. (Appropriations that *are* time-limited themselves show variety: Most are annual, but some last for longer periods—say, two or five years.\*) "Standing" appropriations—those making funds "always available for specified purposes" without "requir[ing] repeated [legislative] action"—have a long history. GAO, Principles of Federal Appropriations Law, p. 2–10 (rev. 4th ed. 2016). As the Court notes, the First Congress, by setting up fee-based schemes, provided the Customs Service and Post Office with indefinite funding. See *ante*, at 13–14, 17. And in doing so, that Congress again inspired its successors. Standing appropriations proliferated during the 19th century; by 1880, 138 statutes making them were on the books. See S. Rep. No. 334, 46th Cong., 2d Sess., 4–7 (1880) (listing statutes). And the growth has not stopped: By Fiscal Year 2022, spending that does not require periodic appropriations (whether annual or longer) accounted for nearly two-thirds of the federal budget. See Congressional Budget Office, The Accuracy of CBO's Budget Projections

———————

\*See, *e.g.*, Foreign Operations, Export Financing, and Related Programs Appropriations Act, 2001, §101(a), 114 Stat. 1900 *et seq.* (2-year appropriations); Military Construction Appropriations Act of 1986, 99 Stat. 1024 (5-year appropriations).

for Fiscal Year 2022, p. 3 (Jan. 2023). Frequently, too, standing appropriations do not designate specific sums of money, thus combining one type of flexibility with another. They instead may provide the sums "necessary for purposes of" a program—such as to provide unemployment assistance or give scholarships to veterans' dependents. 15 U. S. C. §9023(d)(3); see 20 U. S. C. §1070h(f). So again, Congress's non-time-limited grant to the CFPB for amounts (up to a cap) "reasonably necessary to carry out" its duties falls within an established tradition. 12 U. S. C. §5497(a).

And "flexible approaches to appropriations" have been particularly common in the sphere of financial regulation. *Ante*, at 13. There, Congress's adoption of assessment-based funding mechanisms (similar to those the First Congress used for the Customs Service and Post Office, see *supra,* at 3) has meant that regulators do not have to seek yearly legislative funding. And they generally may devote the funds they collect to any of a range of activities. For example, the Office of the Comptroller of the Currency has authority to levy assessments on banks as "necessary or appropriate to carry out [its] responsibilities." 12 U. S. C. §16; see also Act of Feb. 19, 1875, ch. 89, 18 Stat. 329. Similarly, the Federal Reserve Board assesses Federal Reserve Banks for whatever amount is "sufficient to pay its estimated expenses." 12 U. S. C. §243; see also Federal Reserve Act, 38 Stat. 261 (1913). Indeed, not a single federal bank regulator is currently, or has been for a long while, funded by standard congressional appropriations. The CFPB received from those regulators most of the powers it wields today. So it is not surprising that the CFPB also inherited a bank-funded scheme enabling it to allocate moneys, at its own discretion, to carry out its responsibilities.

I would therefore add one more point to the Court's opinion. As the Court describes, the Appropriations Clause's text and founding-era history support the constitutionality of the CFPB's funding. See *ante*, at 6. And so too does a

continuing tradition. Throughout our history, Congress has created a variety of mechanisms to pay for government operations. Some schemes specified amounts to go to designated items; others left greater discretion to the Executive. Some were limited in duration; others were permanent. Some relied on general Treasury moneys; others designated alternative sources of funds. Whether or not the CFPB's mechanism has an exact replica, its essentials are nothing new. And it was devised more than two centuries into an unbroken congressional practice, beginning at the beginning, of innovation and adaptation in appropriating funds. The way our Government has actually worked, over our entire experience, thus provides another reason to uphold Congress's decision about how to fund the CFPB.

# SUPREME COURT OF THE UNITED STATES

—————

No. 22–448

—————

CONSUMER FINANCIAL PROTECTION BUREAU, ET AL., PETITIONERS *v.* COMMUNITY FINANCIAL SERVICES ASSOCIATION OF AMERICA, LIMITED, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[May 16, 2024]

JUSTICE JACKSON, concurring.

Today, the Court correctly concludes that, based on the plain meaning of the text of the Appropriations Clause, "an appropriation is simply a law that authorizes expenditures from a specified source of public money for designated purposes." *Ante,* at 5. The statute that Congress passed to fund the Consumer Financial Protection Bureau easily meets the Appropriations Clause's minimal requirements. See *ante,* at 15. It authorizes the Bureau to withdraw money from "the combined earnings of the Federal Reserve System," 12 U. S. C. §5497(a)(1), in order "to pay the expenses of the Bureau in carrying out its duties and responsibilities," §5497(c)(1). In my view, nothing more is needed to decide this case.

Indeed, there are good reasons to go no further. When the Constitution's text does not provide a limit to a coordinate branch's power, we should not lightly assume that Article III implicitly directs the Judiciary to find one. The Constitution was "intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs." *McCulloch* v. *Maryland*, 4 Wheat. 316, 415 (1819) (emphasis deleted). An essential aspect of the Constitution's endurance is that it empowers the political branches

to address new challenges by enacting new laws and poli-
cies—without undue interference by courts.  To that end,
we have made clear in cases too numerous to count that
nothing in the Constitution gives federal courts "'some
amorphous general supervision of the operations of govern-
ment.'" *Raines* v. *Byrd*, 521 U. S. 811, 829 (1997) (quoting
*United States* v. *Richardson*, 418 U. S. 166, 192 (1974)
(Powell, J., concurring)).  Put another way, the principle of
separation of powers manifested in the Constitution's text
applies with just as much force to the Judiciary as it does
to Congress and the Executive.  See *Public Workers* v.
*Mitchell*, 330 U. S. 75, 90–91 (1947).

This case illustrates why.  As the Court explains, in re-
sponse to the devastation wrought by the 2008 financial cri-
sis, Congress passed and the President signed the Dodd-
Frank Wall Street Reform and Consumer Protection Act.
See *ante,* at 2.  In that statute, Congress chose to fund the
Bureau outside of the annual appropriations process.  See
*ante,* at 3.  Drawing on its extensive experience in financial
regulation, Congress designed the funding scheme to pro-
tect the Bureau from the risk that powerful regulated enti-
ties might capture the annual appropriations process.  See,
*e.g.*, S. Rep. No. 111–176, pp. 162–164 (2010); A. Levitin,
The Politics of Financial Regulation and the Regulation of
Financial Politics, 127 Harv. L. Rev. 1991, 2056–2058
(2014); R. Barkow, Insulating Agencies, 89 Texas L. Rev.
15, 42–45, 67, 77 (2010); see also *ante,* at 4 (KAGAN, J., con-
curring) (describing long history of congressional flexibility
in designing funding schemes for financial regulators).

Respondents, two associations of payday lenders, repre-
sent exactly the type of entity the Bureau's progenitors
sought to regulate and whose influence Congress may have
feared.  See O. Bar-Gill & E. Warren, Making Credit Safer,
157 U. Pa. L. Rev. 1, 44–45, 55–59, 68–70 (2008).  In urging
us to find the Bureau's funding scheme unconstitutional,

then, respondents would not only have us find unstated limits in the Constitution's text, they would have us undercut the considered judgments of a coordinate branch about how to respond to a pressing national concern.

Of course, to say that Congress had reasons for designing the Bureau's funding scheme in the manner it did is not to endorse those policy choices. "With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal." *Nebbia* v. *New York*, 291 U. S. 502, 537 (1934). Instead, the Constitution places primary responsibility for checking the political branches with the People. See *King* v. *Burwell*, 576 U. S. 473, 498 (2015) ("In a democracy, the power to make the law rests with those chosen by the people"). It is to them that the Court rightly returns any remaining policy questions posed by today's case.

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–448

_____

## CONSUMER FINANCIAL PROTECTION BUREAU, ET AL., PETITIONERS *v.* COMMUNITY FINANCIAL SERVICES ASSOCIATION OF AMERICA, LIMITED, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[May 16, 2024]

JUSTICE ALITO, with whom JUSTICE GORSUCH joins, dissenting.

Since the earliest days of our Republic, Congress's "power over the purse" has been its "most complete and effectual weapon" to ensure that the other branches do not exceed or abuse their authority. The Federalist No. 58, p. 359 (C. Rossiter ed. 1961) (J. Madison). The Appropriations Clause protects this power by providing that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." Art. I, §9, cl. 7. This provision has a rich history extending back centuries before the founding of our country. Its aim is to ensure that the people's elected representatives monitor and control the expenditure of public funds and the projects they finance, and it imposes on Congress an important duty that it cannot sign away. "Any other course" would give the Executive "a most dangerous discretion." *Reeside* v. *Walker*, 11 How. 272, 291 (1851).

Unfortunately, today's decision turns the Appropriations Clause into a minor vestige. The Court upholds a novel statutory scheme under which the powerful Consumer Financial Protection Bureau (CFPB) may bankroll its own agenda without any congressional control or oversight. Ac-

cording to the Court, all that the Appropriations Clause de-
mands is that Congress "identify a source of public funds
and authorize the expenditure of those funds for designated
purposes." *Ante*, at 6. Under this interpretation, the
Clause imposes no temporal limit that would prevent Con-
gress from authorizing the Executive to spend public funds
in perpetuity. Contra, Montesquieu, The Spirit of the Laws,
bk. XI, ch. VI, p. 160 (O. Piest ed., T. Nugent transl. 1949)
(warning that a legislature will lose its power of the purse
if it passes an appropriation that lasts "forever"). Nor does
the Court's interpretation require Congress to set an upper
limit on the amount of money that the Executive may take.
Today's decision does not even demand that an agency's
funds come from the Treasury. As the Solicitor General ad-
mitted at argument, under this interpretation, the Appro-
priations Clause would permit an agency to be funded en-
tirely by private sources. Tr. of Oral Arg. 34–35. In short,
there is apparently nothing wrong with a law that empow-
ers the Executive to draw as much money as it wants from
any identified source for any permissible purpose until the
end of time.

That is not what the Appropriations Clause was under-
stood to mean when it was adopted. In England, Parlia-
ment had won the power over the purse only after centuries
of struggle with the Crown. Steeped in English constitu-
tional history, the Framers placed the Appropriations
Clause in the Constitution to protect this hard-won legisla-
tive power.

## I

In the 2010 Dodd-Frank Wall Street Reform and Con-
sumer Protection Act, Congress created the CFPB, an inde-
pendent regulatory agency with "vast rulemaking, enforce-
ment, and adjudicatory authority over a significant portion
of the U. S. economy." *Seila Law LLC* v. *Consumer Finan-
cial Protection Bureau*, 591 U. S. 197, 203 (2020); see *id.*, at

222, n. 8. And in designing the CFPB, "Congress deviated from the structure of nearly every other independent administrative agency in our history." *Id.*, at 203. At every turn, the statute attempted to insulate the CFPB from control by any official answerable to the people. First, "Congress provided that the CFPB would be led by a single Director, who serves for a longer term than the President," and Congress attempted to protect the Director from removal by the President "except for inefficiency, neglect, or malfeasance." *Ibid.* In *Seila Law*, we struck down this restriction because it placed "potent" power in the hands of an official who was "neither elected by the people nor meaningfully controlled . . . by someone who is." *Id.*, at 206, 224–225.

Elected in the atmosphere that followed the financial crisis of 2008, the Congress that created the CFPB also sought to free the CFPB from supervision by subsequent Congresses that might wish to superintend the Bureau's exercise of its vast powers. To achieve that end, the CFPB was given an unprecedented way of obtaining funds that was expressly designed to make it totally "independent of the Congressional appropriations process." S. Rep. No. 111–176, p. 163 (2010).

Under that scheme, the CFPB is not funded by appropriations enacted by Congress. Instead, each year, the CFPB Director tells the Federal Reserve Board of Governors how much money it thinks is "reasonably necessary" to carry out the CFPB's operations. 12 U. S. C. §5497(a)(1). So long as this amount does not exceed 12% of the Federal Reserve System's total operating expenses, the Board of Governors must comply with that demand and hand over the specified sum "from the combined earnings of the Federal Reserve System." §§5497(a)(1), (2)(A). These earnings come from the Federal Reserve Banks, which are federally chartered corporations that are "not departments of the government." *Emergency Fleet Corp.* v. *Western Union Telegraph Co.*, 275

U. S. 415, 426 (1928); see §341.[1]   The Federal Reserve
Banks' earnings represent interest on and gains derived
from the purchase and sale of securities, as well as fees they
receive for services provided to depository institutions,
"such as check clearing, funds transfers, and automated
clearinghouse operations."  United States Federal Reserve
System, The Fed Explained: What the Central Bank Does
4 (11th ed. 2021); see also Brief for Petitioners 23.  At pre-
sent, the CFPB's maximum annual draw is nearly $750 mil-
lion.[2]

In addition, the CFPB, unlike most agencies, does not
have to return any unspent funds to the Treasury.   12
U. S. C. §5497(b).  Instead, the CFPB may invest or roll over
any unspent money into a separate fund, which it may use
in the future "to pay the expenses of the [CFPB] in carrying
out its duties and responsibilities."  §§5497(b)–(c).[3]  As of
September 30, 2022, the CFPB had built up an endowment
worth nearly $340 million.  See 2022 Report, at 86.

In devising this novel scheme, Congress appears to have
anticipated that it might be challenged under the Appropri-
ations Clause, and Congress therefore attempted to shield
its new creation by providing that "[f]unds obtained by or
transferred to the [CFPB] shall not be construed to be Gov-
ernment funds or appropriated monies."[4]  §5497(c)(2).  And

––––––––––

[1] Each Federal Reserve Bank has a Board of nine Directors—six are
elected by private member banks, and three are appointed by the Federal
Reserve System's Board of Governors.  12 U. S. C. §§302, 304.

[2] In the most recent fiscal year, the Bureau requested $641.5 million of
its then-applicable $734 million limit.  Financial Report of the Consumer
Financial Protection Bureau: Fiscal Year 2022, pp. 44–45 (Nov. 15, 2022)
(2022 Report) (online source archived at https://www.supremecourt.gov).

[3] The CFPB invests these funds in 3-month Treasury bills, from which
it receives an annualized return of 5%.  See Board of Governors of the
Federal Reserve System, 3-Month Treasury Bill Secondary Market Rate,
Discount Basis, Economic Research: Federal Reserve Bank of St. Louis
(Mar. 13, 2024), https://fred.stlouisfed.org/series/DTB3.

[4] Congress obviously cannot evade the Appropriations Clause simply

to impede congressional oversight of the CFPB's use of this money, the Act added that the Bureau's funds are not "subject to review by the Committees on Appropriations." §5497(a)(2)(C).

The Framers would be shocked, even horrified, by this scheme. Beginning with the First Congress, agencies[5] were generally funded by annual appropriations from the Treasury. K. Stith, Congress' Power of the Purse, 97 Yale L. J. 1343, 1354, n. 53 (1988) (Stith). While there have been departures from this dominant model, nothing like the CFPB's funding scheme has previously been seen. In the decision below, the Fifth Circuit held that the CFPB's unparalleled financial independence violates the Appropriations Clause and "the constitutional separation of powers." 51 F. 4th 616, 642 (2022). Because I agree that the CFPB's funding structure is unconstitutional, I would affirm the Fifth Circuit's judgment.

## II
### A

The Appropriations Clause is found in Article I, §9, clause 7, of the Constitution, which provides:

> "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."

The first part of this provision is customarily called the Appropriations Clause, and the second is referred to as the

---

by placing a different label on an authorization to obtain and spend money that falls within the meaning of an "Appropriatio[n]" under that provision. And here, the Government argues that the statutory provision cited in the text was not meant to have that effect, but was adopted for other purposes. See Tr. of Oral Arg. 20.

[5] For want of a better term, I use the term "agency" to refer to any component of the Executive Branch.

Statement and Account Clause.

The Appropriations Clause contains two key terms—
"Money . . . drawn from the Treasury" and "Appropria-
tions"—both of which require a little explanation.  As the
Government acknowledges, "Money . . . drawn from the
Treasury" is synonymous with the term "public Money,"[6]
which appears in the Statement and Account Clause.  And
in this case, it is undisputed that the funds requisitioned by
the CFPB constitute "public Money."[7]  Thus, the only re-
maining textual question is whether the CFPB gets its
funding from "Appropriations" in the sense in which the
Constitution uses that term.

The Court answers that question by consulting a few old
dictionaries, which it says establish that "[i]n ordinary us-
age, . . . an appropriation of public money would be a law
authorizing the expenditure of particular funds for speci-
fied ends."  *Ante,* at 7.  It accordingly concludes that the
Appropriations Clause requires no more than a law, a fund,
and a purpose.  *Ante*, at 6–7.

This analysis overlooks the fact that the term "Appropri-
ations," as used in the Constitution, is a term of art whose
meaning has been fleshed out by centuries of history.  To be
sure, in interpreting the Constitution, we *start* with the pre-
sumption that "'its words and phrases'" carry their "'nor-
mal and ordinary'" meaning.  *District of Columbia* v. *Heller*,
554 U. S. 570, 576 (2008) (quoting *United States* v. *Sprague*,
282 U. S. 716, 731 (1931)).  But our analysis cannot end
there.  Some provisions use terms with specialized and well-
established meanings that we cannot use dictionaries to
brush aside.  "'[I]f a word is obviously transplanted from
another legal source, whether the common law or other leg-
islation, it brings the old soil with it.'"  *Sekhar* v. *United
States*, 570 U. S. 729, 733 (2013); see also A. Scalia & B.

_____

[6] See, *e.g.*, Tr. of Oral Arg. 34; Stith 1357.

[7] See, *e.g.*, Tr. of Oral Arg. 19, 34.

Garner, Reading Law: The Interpretation of Legal Texts 73–77 (2012). Applied here, this rule means that the term "Appropriatio[n]" should be interpreted in light of "legal tradition and . . . centuries of practice." *Morissette* v. *United States*, 342 U. S. 246, 263 (1952). I therefore turn to that history.

## B

### 1

The delegates to the Constitutional Convention did not invent the appropriations requirement. Rather, that important safeguard arose from centuries of "British experience." *Consumer Financial Protection Bureau* v. *All Am. Check Cashing, Inc.,* 33 F. 4th 218, 224 (CA5 2022) (en banc) (Jones, J., concurring). The Framers were aware of the requirement's deep roots and the critical role it had played in "the history of the British Constitution." The Federalist No. 58, at 359. By steadily asserting the power to condition appropriations, the House of Commons, originally "an infant and humble representation of the people[,] gradually enlarg[ed] the sphere of its activity and importance, and finally reduc[ed], as far as it seems to have wished, all the overgrown prerogatives of the other branches of the government." *Ibid.*

A short summary of this process illustrates the important role of the appropriations requirement. During the Middle Ages, kings relied almost entirely on what was called "ordinary" revenue. F. Maitland, The Constitutional History of England 433 (1908) (reprint 1993) (Maitland). This included income from lands owned by the Crown, customs duties, and feudal dues. See 1 W. Blackstone, Commentaries on the Laws of England 281–306 (2d ed. 1766). Consequently, there was little meaningful difference "between the national revenue and the king's private pocket-money." Maitland 433.

The Crown's financial independence gave it the ability to

govern with little parliamentary interference.  As Maitland
puts it, "throughout the Middle Ages the king's revenue had
been in a very true sense the king's revenue, and parlia-
ment had but seldom attempted to give him orders as to
what he should do with it."  *Id.,* at 309.  "Under the Tudors,
parliament hardly dared to meddle with such matters."
*Ibid.*

In the 17th century, however, this pattern began to
change.  *Id.*, at 309–310.  By that time, "the king's ordinary
revenues were no longer even remotely sufficient to cover
the normal costs of royal governance," and the heavy ex-
penditures of James I and Charles I exacerbated the prob-
lem.   J. Chafetz, Congress's Constitution 47 (2017)
(Chafetz).  Rather than seeking appropriations from Parlia-
ment, the early Stuart kings engaged in controversial ef-
forts to obtain additional ordinary income through the use
of various royal "prerogative[s]."  G. Smith, A Constitu-
tional and Legal History of England 315 (1955) (Smith).
Among other things, they unilaterally imposed duties on
imports, stepped up the collection of feudal dues, sold mo-
nopolies, and forced individuals to loan money on pain of
imprisonment.  See *id.*, at 315, 318.

These measures aroused opposition and, in any event, did
not yield sufficient funds.  As a result, James I and Charles
I periodically found it necessary to ask Parliament to im-
pose new taxes in order to obtain the funds they wanted.
When they did so, the Commons began to flex the power of
the purse and to demand a measure of royal accountability.
Disputes between the Commons and the Stuart kings about
the power of the purse played a pivotal role in the transition
from royal to parliamentary financial supremacy.

A few incidents illustrate this dynamic.  In 1621, the
power of the purse played a central role in disputes between
the Crown and Parliament over religious, geopolitical, and
judicial authority.  For some months, Parliament ignored
requests from James I for more tax revenue.  T. Taswell-

Langmead, English Constitutional History From the Teutonic Conquest to the Present Time 532 (3d ed. 1886) (Taswell-Langmead). Though Parliament finally expressed "willing[ness] to grant a moderate subsidy," it insisted "first" on redress for "grievances." *Id.*, at 533; see also Smith 315–316. Parliament's petition infuriated James I, who ultimately dissolved Parliament and sent several of its leaders—including Sir Matthew Hale—to the Tower of London. Taswell-Langmead 534, 536.

Under Charles I, the situation worsened. At the beginning of his reign, the Commons refused to grant him the life-time power to impose tonnage and poundage duties, *i.e.*, duties on imports and exports, as had been the custom, but instead granted the power for only one year. *Id.*, at 539. The members of Commons "had no intention of refusing a further supply, but were resolved to avail themselves of their Constitutional right to make it dependent upon redress of grievances." *Ibid.* Indignant about this temerity, the King hastily dissolved Parliament before the Lords passed the bill. *Id.*, at 540; Smith 318. But as a consequence, the King once again then found himself without sufficient funds. So he took matters into his own hands by resorting to the monarchy's "old illegal methods of raising money." Taswell-Langmead 543.

This reignited a power struggle between the two branches. As a result, when Charles I again turned to Parliament in 1628, the Commons refused to grant funds until he agreed to the Petition of Right, which demanded that he cease efforts to obtain more "ordinary income" by objectionable means, such as compulsory loans and the payment of "any tax, tallage,[8] aid, or other like charge not set by common consent, in parliament." 3 Car. I., c. 1. (1628). The

_____

[8] A tallage is "[a]n arbitrary tax levied by the monarch on towns and lands belonging to the crown." Black's Law Dictionary 1756 (11th ed. 2009).

King, of course, did not like this. So when the Commons
continued to challenge royal prerogatives, Charles I pro-
rogued Parliament. And during the long period that ensued
in which Parliament did not meet (1629–1640), the King
sought new sources of "ordinary income," including the im-
position of "Ship-money," that is, fees imposed on both mar-
itime and inland counties to pay for the construction of
ships. Taswell-Langmead 566–569. These practices "fur-
ther enraged an already alienated Parliament, reinforcing
a vicious cycle that led to the Civil War and, ultimately, to
Charles's beheading." Chafetz 47.

This constitutional crisis restored the English Govern-
ment's financial separation of powers for a season. During
the Commonwealth, the Commons exercised "complete au-
thority . . . over the whole receipts and expenditure of the
national treasury." Taswell-Langmead 626. But shortly af-
ter the Restoration, the war for the supremacy of the purse
reignited. Starting in 1665, "Parliament was largely un-
willing to grant [the King] additional money without speci-
fying in some measure how it was to be used." Chafetz 50.
"This precedent was followed in some, but not all . . . cases
under Charles II." Maitland 310. Charles II, "fed up with
parliamentary interference, ruled without Parliament, and
therefore without any parliamentary taxation, for the rest
of his reign." Chafetz 50.

After the Revolution of 1688, Parliament took strong
measures to curb the Crown's financial independence. The
1689 Bill of Rights declared "[t]hat levying Money for or to
the Use of the Crowne by pretence of Prerogative, without
Grant of Parlyament for longer time or in other manner
than the same is or shall be granted is Illegall." 1 Wm. 3 &
Mary 2, c. 2 (1688). In other words, to ensure "that it was
supreme in directing the use of [all] public funds," Parlia-
ment "asserted that any use of funds by the monarch that
lacked Parliament's authorization was unlawful." Congres-

sional Research Service, S. Stiff, Congress's Power Over Appropriations: Constitutional and Statutory Provisions 8 (2020).

These steps, however, did not cement Parliament's power of the purse. Royal officers continued to collect revenue and to evade the appropriations requirement by exaggerating collection costs, giving very little in "net receipts" to Parliament, and keeping the rest for the use of the Crown. P. Einzig, The Control of the Purse 164, 188 (1959) (Einzig). So Parliament took steps to crack down on this practice. *Id.*, at 188. In 1711, for example, Parliament passed a resolution declaring that "'applying any sum of unappropriated money, or surplusages of funds to usages not voted, or addressed for by parliament, hath been a misapplication of the public money.'" 6 Cobbett's Parliamentary History of England 1025 (1810).

Parliament also appointed a commission to prevent the Crown from defying the appropriations requirement. In that commission's very first report, it recommended that "[r]evenue should come from the Pocket of the Subject directly into the Exchequer." Report Relative to the Balances in the Hands of the Receivers General of the Land Tax, Nov. 27, 1780 (First Report), reprinted in 1 Reports of the Commissioners Appointed To Examine, Take, and State the Public Accounts of the Kingdom 14 (W. Molleson ed. 1783). Permitting revenue departments to retain or divert any public funds, the Commissioners concluded, would create a "private Interest . . . in direct Opposition to that of the Public." *Ibid.* Finally, Parliament took an increasingly "firmer line . . . against *virement*, that is, the transfer of funds appropriated for one department for the use of another department." Einzig 144.

2

The Court's treatment of this history begins by conceding most of what I have recounted. The Court notes that after

the Revolution of 1688, "Parliament's usual practice was to
appropriate government revenue 'to particular purposes
more or less narrowly defined,'" and "Parliament began
limiting the duration of its revenue grants." *Ante*, at 9
(quoting Maitland 433). "'Every year,'" the Court contin-
ues, the King and his ministers "'had to come, cap in hand,
to the House of Commons, and more often than not the
Commons drove a bargain and exacted a *quid pro quo* in
return for supply.'" *Ant*e, at 9 (quoting G. Trevelyan, The
English Revolution of 1688–1689, pp. 180–181 (1939)).

In an effort to find a trace of helpful precedent in pre-
founding British constitutional history, the Court turns to
laws appropriating funds for the "civil list," which it touts
as a particularly "notable exception" to the centuries-long
understanding of appropriations. *Ante*, at 9, 12, 19. In
truth, however, Parliament's treatment of the civil list ac-
tually undermines the Court's position. The civil list, alt-
hough renamed in 2012, remains to this day, and it consists
of the money needed to cover the expenses of the royal fam-
ily.[9] By the end of the 17th century, "the Civil List was a
relatively small share of the total public expenditure," but
the independence it afforded the Crown "presented a con-
stitutional problem in the conflict between the principle of
the independence of the Crown and the principle of parlia-
mentary control of finance." E. Reitan, The Civil List in
Eighteenth-Century British Politics: Parliamentary Su-
premacy Versus the Independence of the Crown, 9 Hist. J.
318, 320, 322 (1966) (Reitan).

To prevent the Crown from using the civil list to erode
Parliament's hard-fought supremacy over the purse, emi-
nent statesmen like Edmund Burke and Charles James Fox
began pushing for substantial reforms. *Id.*, at 328–337. Be-
ginning in 1760, Parliament enacted a series of laws that

--------

[9] See Royal Finances, https://www.royal.uk/royal-finances (Apr. 22,
2024).

altered the appropriation of civil list funds. *Id*., at 324; see, *e.g.*, 1 H. Cavendish, Debates of the House of Commons 267–307 (1841). And by 1782, Parliament finally secured its "right . . . to interfere at its discretion in the affairs of the Civil List." Reitan 336–337. "The eighteenth-century tension between the conflicting principles of parliamentary supremacy and an independent financial provision for the Crown had been resolved—as it had to be—in favour of parliamentary supremacy." *Id.,* at 336.

### C

#### 1

"The conflicts between Parliament and the Crown over the power of the purse . . . were replayed in the American colonies in struggles between the royal governors and provincial assemblies." R. Rosen, Funding "Non-Traditional" Military Operations: The Alluring Myth of a Presidential Power of the Purse, 155 Mil. L. Rev. 1, 44 (1998); see also P. Wolfson, Is a Presidential Item Veto Constitutional? 96 Yale L. J. 838, 841–842 (1987). But learning from Parliament's experiences with the monarchy, some of the American Colonies assumed appropriations authority "greater even than that of the British House of Commons," exercising significant auditing powers and legislative oversight. J. Greene, The Quest for Power: The Lower Houses of Assembly in the Southern Royal Colonies 106 (1963). Indeed, by 1787, all but one of the 11 State Constitutions provided their respective legislatures with some control over appropriations; and no State allowed the executive to draw money from the state treasury without legislative approval. Chafetz 55, and nn. 119–120 (citing provisions); see also The Federalist No. 48, at 310 (J. Madison) (noting that, under many state constitutions, "the legislative department alone has access to the pockets of the people").

The Framers built on this legacy at the Constitutional Convention when they adopted the Appropriations Clause,

which they "well understood" would "complet[e] the power
vested in Congress over money."  7 Annals of Cong. 1124
(1798) (statement of Rep. Albert Gallatin).  The Clause not
only "gives to the Legislature an exclusive authority of rais-
ing and granting money," but it also obligates Congress to
keep that authority from "the hands of the Executive" at all
times thereafter.  *Ibid.*  It makes the President "depen[d] on
the will of [Congress] for supplies of money" in the first in-
stance and puts him continually "in a state of subordinate
dependence" to the people's elected representatives.  3 De-
bates on the Constitution 17 (J. Elliot ed. 1836) (statement
of Wilson Nicholas).  The Appropriations Clause enables
Congress, "*without the concurrence of the other branches*, to
check, by refusing money, any mischief in the operations
carrying on in any department of the Government."  5 An-
nals of Cong. 509 (1796) (statement of Rep. William Branch
Giles) (emphasis added).

Early budgets illustrate how the appropriations power
was understood.  Although the Constitution does not re-
quire that appropriations be limited to a single year, that
was the dominant practice in the years immediately follow-
ing the adoption of the Constitution.  See *ante*, at 12.  And
while the first few appropriations laws were brief and
lacked details about how the money was to be spent, the
amounts approved closely tracked the estimates submitted
by Secretary of the Treasury Alexander Hamilton.  See
Chafetz 58–59.  Indeed, the second appropriations act ex-
pressly incorporated the estimates of specific expenses con-
tained in Hamilton's report to Congress.  Compare Appro-
priations Act, §1, 1 Stat. 104, with 5 American State
Papers: Finance 33 (1832).  As a result, Congress clearly
contemplated that the money would be devoted toward par-
ticular purposes.

In the mid-1790s, appropriations laws became even more
specific.  Chafetz 59.  And when Thomas Jefferson became
President, he urged Congress "to multiply barriers against"

the "dissipation" of public funds by "appropriating specific sums to every specific purpose susceptible of definition," and "by disallowing applications of money varying from the appropriation in object, or transcending it in amount." First Annual Message (Dec. 8, 1801), reprinted in 9 The Works of Thomas Jefferson 336 (P. Ford ed. 1905); see also Letter from Albert Gallatin to Thomas Jefferson (Nov. 1801), reprinted in 1 The Writings of Albert Gallatin 68 (H. Adams ed. 1879) ("Congress should adopt such measures as will effectually guard against misapplication of public moneys").

To be sure, not all early funding laws followed the dominant model of specified short-term appropriations. Agencies that provided services to a particular segment of the public were funded by fees that were paid by the recipients of those services. See, *e.g.*, Act of Feb. 20, 1792, §§2–3, 1 Stat. 233–234 (funding the Post Office through collection of postage rates); Act of Apr. 2, 1792, ch. 16, §§1, 14, 1 Stat. 246, 249 (funding the National Mint in part through collection of fees); Act of July 31, 1789, §29, 1 Stat. 44–45 (funding customs collection through tonnage fees). If these fees exceeded the costs of providing the services, however, these agencies were required to send the surplus to the Treasury, which oversaw the collection and use of such fees.[10]

As the Government notes, Brief for Petitioners 21–22,

_____

[10] At the founding, it was well understood that "the unexpended balance of any appropriation after a given period passes to the surplus fund." 16 Annals of Cong. 393 (1807) (statement of Rep. David Thomas). See, *e.g.,* Act of Feb. 11, 1791, ch. 6, 1 Stat. 190 (recognizing default rule that surplus funds return to the Treasury); see also Act of Feb. 20, 1792, §§3–4, 1 Stat. 234 (requiring the Postmaster General to "pay, quarterly, into the treasury of the United States, the balance" of any receipts after using them to "defray the expense" of services provided); Act of July 31, 1789, §38, 1 Stat. 48 (providing that an unexpended portion of all customs and fines shall be "paid into the treasury" thereof); Act of Sept. 2, 1789, ch. 12, §2, 1 Stat. 65 ( "[I]t shall be the duty of the Secretary of the Treasury to . . . superintend the collection of the revenue").

this practice had deep historical roots, see N. Parrillo,
Against the Profit Motive 65 (2013) (Parrillo),[11] and was
presumably based on the idea that the cost of providing cer-
tain services should be borne by the recipients of those ser-
vices rather than the general public.  At the same time, the
requirement that fees in excess of what was needed to de-
fray the cost of providing services be turned over to the
Treasury ensured that Congress maintained control over
the ways in which this money was spent.  Under these ar-
rangements, therefore, Congress exercised close control
over both the amount of money that the agencies in ques-
tion obtained and the way in which that money was used.
The agencies received and were allowed to use the amount
of money necessary to provide their narrowly prescribed
services.  All the rest was sent to the Treasury and could
then be used only as authorized by a congressional appro-
priation.

2

In discussing this early American history, the Court be-
gins by essentially conceding the principal lesson outlined
above.  As the Court candidly puts it, "'[w]hen called upon
to grant supplies,' the lower houses in the colonial assem-
blies 'insisted upon appropriating them in detail.'" *Ante*, at
10.[12]  The best the Court can muster to support its assertion
that "state legislative bodies often opted for open-ended,
discretionary appropriations" are a few minor state laws
that, when understood in relation to the Constitutions of
the States in question, provide no support for the Court's
argument.  *Ibid.*[13]

--------

[11] Parliament and "nearly all the American colonial legislatures" used
such fees "to cover many and sometimes all of the offices within their
respective bounds."  Parrillo 65.

[12] Many sources document this general approach.  See, *e.g.*, P. Figley &
J. Tidmarsh, The Appropriations Power and Sovereign Immunity, 107
Mich. L. Rev. 1207, 1244 (2009).

[13] Citing two Massachusetts laws directing that certain revenue be

\*     \*     \*

In sum, centuries of historical practice show that the Appropriations Clause demands legislative control over the source and disposition of the money used to finance Government operations and projects.[14]

———————

used for broadly defined purposes, the Court infers that the executive enjoyed wide discretion to decide how this money would be spent, see *ante*, at 11, but this inference is unwarranted. One of the two Massachusetts laws cited by the Court, Act of Nov. 17, 1786, 1786 Mass. Acts and Laws ch. 47, p. 117, clearly illustrates this point. That law stated expressly that the revenue in question was to be paid "into the Treasury of this Commonwealth, for the exigencies of Government." *Ibid.* Under the State Constitution, this money could be not be taken from the treasury without the approval of the legislature. See Mass. Const. of 1780, ch. 2, §1, Art. XI. And to fortify legislative control, the state treasurer was elected annually by the legislature. *Id.*, ch. 2, §4.

As another supposed example of a state law giving the executive wide discretion to decide how funds could be spent, the Court cites a Maryland law specifying that certain revenue was to be used for the general purpose of defending the Chesapeake Bay and protecting trade. 1783 Md. Acts ch. 26, §5, reprinted in 1 W. Kilty, The Laws of Maryland (1799). The Court overlooks the fact that under the State's Constitution, the two state treasurers were appointed by and served at the pleasure of the legislature, Maryland Constitution of 1776, Art. XIII, and the legislature was specifically authorized to "examine and pass all accounts of the State, relating either to the collection or expenditure of the revenue, or appoint auditors, to state and adjust the same," Art. X.

Finally, the Court points to a Virginia law, *ante*, at 11, but again the Court overlooks the structure of the Virginia government. Under the Virginia Constitution of 1776, the treasurer was elected annually by the legislature, and this obviously gave the legislature extensive power over expenditures. Virginia Constitution of 1776, ¶17; see Chafetz 55 (referring to the Virginia Legislature's authority over the state treasurer as an "explicit mechanism of legislative control over appropriations").

[14] Not content to rest on the Court's argument, which relies on the Court's understanding of the original meaning of the Appropriations Clause, four Justices advance an entirely different rationale, namely, that congressional practice in the ensuing centuries supports the constitutionality of the CFPB's scheme. *Ante*, at 1 (KAGAN, J., concurring). This argument is doubly flawed. First, the concurrence cannot point to any other law that created a funding scheme like the CFPB's. Second,

## III
## A

As the previous discussion shows, today's case turns on a simple question: Is the CFPB financially accountable to Congress in the way the Appropriations Clause demands? History tells us it is not. As we said in *Seila Law*, "'[p]erhaps the most telling indication of [a] severe constitutional problem' with an executive entity 'is [a] lack of historical precedent' to support it." 591 U. S., at 220 (quoting *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 505 (2010)). And the Government agrees with this principle. In its briefing and at argument, the Government admitted that an utterly unprecedented funding scheme would raise a serious constitutional problem. Reply Brief 18; Tr. of Oral Arg. 11, 26. The Government therefore attempts to show that there is ample precedent for the CFPB scheme, but that effort fails.

The CFPB's funding scheme contains the following features: (1) it applies in perpetuity; (2) the CFPB has discretion to select the amount of funding that it receives, up to a statutory cap; (3) the funds taken by the CFPB come from other entities; (4) those entities are self-funded corporations that obtain their funding from fees on private parties, "not departments of the Government," *Emergency Fleet Corp.*, 275 U. S., at 426; (5) the CFPB is not required to return unspent funds or transfer them to the Treasury; and (6) those funds may be placed in a separate fund that earns interest and may be used to pay the CFPB's expenses in the

---

as explained by Justice Scalia, the separation of powers mandated by the Constitution cannot be altered by a course of practice at odds with our national charter. See *NLRB* v. *Noel Canning*, 573 U. S. 513, 571–572 (2014) (opinion concurring in judgment). "[P]olicing the 'enduring structure' of constitutional government when the political branches fail to do so is 'one of the most vital functions of this Court.'" *Id.*, at 572 (quoting *Public Citizen* v. *Department of Justice*, 491 U. S. 440, 468 (1989) (Kennedy, J., concurring in judgment)).

future.  At argument, the Government was unable to cite any other agency with a funding scheme like this, see Tr. of Oral Arg. 31–33, 39–41, and thus no other agency—old or new—has enjoyed so many layers of insulation from accountability to Congress.

The Government points to the Post Office and the Customs Service as founding-era precedents for the CFPB, but the analogy is flawed.  As noted, funding Government agencies with fees charged to the beneficiaries of their services has long been viewed as consistent with the appropriations requirement.  And both the Post Office and the Customs Service fell comfortably into that category.

A quick look at the laws that set up the Post Office and the Customs Service shows that they were nothing like the CFPB.  In the Act establishing the Post Office, Congress gave that agency a narrow and specific mission: to "provide for carrying the mail of the United States."  See, *e.g.,* Act of Feb. 20, 1792, §3, 1 Stat. 234.  The Postmaster's discretionary authority was modest.  (He could, for example, decide whether mail should be carried on particular routes "by stage carriages or horses." *Ibid.*)  The Act specified in minute detail the fees that could be collected from those who used the Post Office's services.  §9, *id.*, at 235.  And it required the Postmaster "to render to the secretary of the treasury, a quarterly account of all the receipts and expenditures" and to "pay quarterly, into the treasury . . . , the balance in his hands."  §4, *id.*, at 234.  Under this arrangement, Congress controlled the amount that the Post Office took in (*i.e.*, the sum total of the fees specified by law) and how those fees were to be spent (*i.e.*, to provide for carrying the mail).

Much the same is true with respect to the Customs Service, which the Government claims "best" resembles the CFPB.  Tr. of Oral Arg. 31.  Like the Post Office, the Customs Service had a carefully delineated mission—basically, to control imports and exports, and to collect duties and

other payments from those engaged in those activities. To
maintain accountability, the early tariff Acts spelled out in
excruciating detail the various fees, fines, and forfeitures
that officers were to collect, as well as the salaries and com-
missions that were to be paid out of those receipts. Act of
July 31, 1789, ch. 5, 1 Stat. 29–49; L. Schmeckebier, The
Customs Service: Its History, Activities and Organization
3–6 (1924). Surplus funds had to be sent to the Treasury,
Act of July 31, 1789, §§9, 38, 1 Stat. 38, 48, and for many
years, these funds were the lifeblood of the Federal Govern-
ment. From 1789 to 1862, "[n]early all of federal revenue
was derived from customs duties." A. Reamer, Before the
U. S. Tariff Commission: Congressional Efforts To Obtain
Statistics and Analysis for Tariff-setting, 1789–1916, in A
Centennial History of the United States International
Trade Commission 35 (2017).[15]

The CFPB, by contrast, is an entirely different creature.
Its powers are broad and vast. It enjoys substantial discre-
tionary authority. It does not collect fees from persons and
entities to which it provides services or persons and entities
that are subject to its authority. And it is permitted to keep
and invest surplus funds. In short, the Government's "best"
argument fails.

The Government's next-best analogs fare no better. Mov-
ing to modern agencies, the Government claims that the
CFPB's funding scheme is not materially different from the
funding schemes of a list of other currently existing agen-
cies. See Brief for Petitioners 22–23, 29–36 (comparing the
CFPB to the Office of the Comptroller of the Currency
(OCC), the Federal Deposit Insurance Corporation (FDIC),
the National Credit Union Administration (NCUA), the
Farm Credit Administration (FCA), the Federal Housing

––––––––––

[15] "In 1792, for example, customs duties . . . accounted for $3.4 million
of the $3.7 million of total government receipts." Founding Choices:
American Economic Policy in the 1790s, p. 101 (D. Irwin & R. Sylla eds.
2010).

Finance Agency (FHFA), and others).

But unlike the CFPB, the agencies cited by the Government are funded in whole or in part by fees charged those who make use of their services or are subject to their regulation. This is true for the OCC, see 12 U. S. C. §16; the FDIC, see §1815; the NCUA, see §1755; the FCA, §2250; and the FHFA, see §4516.[16]

For these reasons, it is undeniable that the combination of features in the CFPB funding scheme is unprecedented. And it is likewise clear that this assemblage was no accident. Rather, it was carefully designed to give the Bureau maximum unaccountability. Our decision in *Seila Law* addressed part of the problem posed by this arrangement. It made the CFPB accountable to the President, but that decision did nothing to protect Congress's power of the purse. Indeed, standing alone, *Seila Law* worsens the appropriations problem. The appropriations requirement developed to ensure that the Executive (in England, the monarch) would be accountable to the people's elected representatives. *Seila Law,* however, increased the power of the *Executive* over appropriations. By brandishing or wielding the

———————

[16] The Government also suggested that the Federal Reserve Board is a close historical analog for the CFPB. Brief for Petitioners 23; Tr. of Oral Arg. 41. But that setup should not be seen as a model for other Government bodies. The Board, which is funded by the earnings of the Federal Reserve Banks, 12 U. S. C. §§243, 244, is a unique institution with a unique historical background. It includes the creation and demise of the First and Second Banks of the United States, as well as the string of financial panics (in 1873, 1893, and 1907) that were widely attributed to the country's lack of a national bank. See generally O. Sprague, History of Crises Under the National Banking System, S. Doc. No. 538, 61st Cong., 2d Sess. (1910). The structure adopted in the Federal Reserve Act of 1913 represented an intensely-bargained compromise between two insistent and influential camps: those who wanted a largely private system, and those who favored a Government-controlled national bank. See, *e.g.*, R. Lowenstein, America's Bank 5–8, 113–116, 265 (2015). For Appropriations Clause purposes, the funding of the Federal Reserve Board should be regarded as a special arrangement sanctioned by history.

threat of removal, a President may push the CFPB director to requisition the amount of money that the President thinks is appropriate and to spend that money as the President wishes. I joined the decision in *Seila Law* and continue to believe that it was correctly decided, but it solved only half the accountability problem that inheres in the CFPB's structure.

B

Left with no analog in history, the Government employs a divide-and-conquer strategy to defend the CFPB's funding scheme. It argues that even if no prior agency had a funding scheme with all the features of the CFPB's, the funding schemes of other presumptively constitutional agencies contain one or more of the features found in the CFPB's scheme. It then reasons that the combination of these features in the CFPB's scheme must be constitutional as well.

This argument founders for two reasons. First, the CFPB's scheme includes an important feature never before seen. As explained, the CFPB's money does not come from Congress, from private recipients of its services, or from private entities that it regulates. It does not even originate with another Government agency. Instead, the CFPB gets its money via a three-step process: The Federal Reserve Banks earn money from the purchase and sale of securities, as well as from the fees they charge for providing services to depository institutions. The Federal Reserve Banks then deliver these earnings to the Federal Reserve System. Finally, the CFPB requests an amount from the Federal Reserve Board. That feature of the CFPB scheme is entirely new.

Second, the Government's argument fails "to engage with the Dodd-Frank Act as a whole." *Seila Law*, 591 U. S., at 230. By addressing the individual elements of the CFPB's setup one-by-one, the Government seeks to divert attention

from the combined layers that insulate the CFPB from accountability to Congress. Elements that are safe or tolerable in isolation may be unsafe when combined. In the case of the CFPB, the combination is deadly. The whole point of the appropriations requirement is to protect "the right of the people," through their elected representatives in Congress, to "be actually consulted" about the expenditure of public money. St. George Tucker, View of the Constitution of the United States 297 (1803) (C. Wilson ed. 1999). The CFPB's design strips the people of this power.

The Federal Reserve's earnings represent "specific charges for specific services to specific individuals or companies." *FPC* v. *New England Power Co.*, 415 U. S. 345, 349 (1974). It would be "a sharp break with our traditions" to allow the CFPB to use these earnings to fund a broader array of governmental activities that have little-to-no relationship with those specific charges, services, and regulated entities. *National Cable Television Assn., Inc.* v. *United States*, 415 U. S. 336, 341 (1974). By allowing the CFPB to use the Federal Reserve's earnings to enforce and implement broader consumer protection laws, Congress impermissibly removed the CFPB "from its customary orbit" as an agency, authorizing the Bureau to appropriate funds obtained from private sources "in the manner of an Appropriations Committee." *Ibid.* In other words, Congress abdicated its appropriations authority, an exclusively legislative prerogative. *Knote* v. *United States*, 95 U. S. 149, 156 (1877). But Congress lacks the authority to "transfer to another branch powers which are strictly and exclusively legislative." *Gundy* v. *United States*, 588 U. S. 128, 135 (2019) (plurality opinion) (internal quotation marks omitted).

In sum, the CFPB's unprecedented combination of funding features affords it the very kind of financial independence that the Appropriations Clause was designed to prevent. It is not an exaggeration to say that the CFPB enjoys

a degree of financial autonomy that a Stuart king would
envy.

C

This autonomy has real-world consequences. The CFPB
is a powerful agency with the authority to impose "substan-
tive rules [on] a wide swath of industries" and "lev[y] knee-
buckling penalties against private citizens." *Seila Law*, 591
U. S., at 222, n. 8. In the last several months alone, the
Bureau has announced plans to effectuate not one, but
three major changes in consumer protection law. The
CFPB has issued guidance cautioning financial institutions
from "denying credit to individuals based on their [illegal]
immigration status, regardless of their personal circum-
stances and demonstrated ability to repay."[17] It has also
begun "a rulemaking process to remove medical bills from
Americans' credit reports"[18] and to cap overdraft fees "at an
established benchmark—as low as $3."[19] These may or may
not be wise policies, but Congress did not specifically au-
thorize any of them, and if the CFPB's financing scheme is
sustained, Congress cannot control or monitor the CFPB's
use of funds to implement such changes. That is precisely
what the Appropriations Clause was meant to prevent.

\*     \*     \*

The Court holds that the Appropriations Clause is satis-
fied by any law that authorizes the Executive to take any

———————

[17] Press Release, Consumer Financial Protection Bureau, CFPB and
Justice Department Issue Joint Statement Cautioning That Financial
Institutions May Not Use Immigration Status To Illegally Discriminate
Against Credit Applicants (Oct. 12, 2023).

[18] Press Release, Consumer Financial Protection Bureau, CFPB Kicks
Off Rulemaking To Remove Medical Bills From Credit Reports (Sept. 21,
2023).

[19] Press Release, Consumer Financial Protection Bureau, CFPB Pro-
poses Rule To Close Bank Overdraft Loophole That Costs Americans Bil-
lions Each Year in Junk Fees (Jan. 17, 2024).

amount of money from any source for any period of time for any lawful purpose. That holding has the virtue of clarity, but such clarity comes at too high a price. There are times when it is our duty to say simply that a law that blatantly attempts to circumvent the Constitution goes too far. This is such a case. Today's decision is not faithful to the original understanding of the Appropriations Clause and the centuries of history that gave birth to the appropriations requirement,[20] and I therefore respectfully dissent.

———————

[20] At the end of its opinion, the Court suggests that broad separation of powers principles may provide more protection for Congress's power of the purse than does the Appropriations Clause. *Ante*, at 18–19. But we do not generally resort to broad principles when a provision of the Constitution specifically addresses the question at hand. See *County of Sacramento* v. *Lewis*, 523 U. S. 833, 843 (1998). At any rate, since the decision below relied on both the Appropriations Clause and broad separation of powers principles, 51 F. 4th 616, 635 (CA5 2022), it is not clear why the Court does not proceed to apply those principles.